This is an action to recover damages for the killing of the plaintiff's intestate by the defendant.
The plaintiff alleges that his intestate, G. W. Boney, was in the employment of the defendant as engineer, and that he was killed on the main line of the defendant near South Rocky Mount, while on duty, at 2:30 o'clock a. m., of 6 November, 1907, by running into an open switch and coming in collision with another train.
The plaintiff alleges various acts of negligence on the part of the defendant. The defendant denies that it was negligent, but admits that the intestate was killed while on duty in the manner alleged.
The defendant also pleads contributory negligence as follows: *Page 80 
For a further defense:
First. That the plaintiff's intestate was a locomotive engineer, and at the time of his death was engineer on a passenger train running from Florence, S.C., to Rocky Mount and beyond; that the printed schedule containing the time-table of the defendant's different trains, and also the rules and regulations to be observed by conductors (98) and engineers running their several trains are furnished when issued to all of its conductors and engineers; that the time-table and schedule which was in force and effect at the time mentioned in the complaint was numbered ten (10) and went into effect 15 September, 1907, at one minute past twelve a. m.; that this schedule or time-table contained the following rules and regulations:
All trains passing through Rocky Mount and South Rocky Mount will approach passenger station at Rocky Mount, N. C. main line cross-over, cross-over at Bassett street telegraph office, South Rocky Mount and middle yard cross-over, under full control, expecting to find tracks occupied. Trains will not exceed six miles per hour passing these points.
That the collision mentioned in the complaint happened at one of the points mentioned in the said rules above quoted. A copy of this schedule containing the said rules and regulations was duly given and furnished to the plaintiff's intestate at the time or before the said schedule and regulations and rules went into effect, and it was his supreme duty to inform himself of all rules and regulations and the time-table applying to his district, and in particular to carefully obey and comply with the rules and regulations above quoted. That in addition to this the following rule was issued from the transportation department:
 ROCKY MOUNT, N.C. 9 September, 1907. BULLETIN No. 18.
C. E. and all Concerned:
All trains passing Rocky Mount and South Rocky Mount, will approach passenger station at Rocky Mount, N. C. main line cross-over, crossing at Bassett street telegraph office, South Rocky Mount and middle-yard cross-over, under full control, expecting to find track occupied. Trains will not exceed six miles per hour passing these points.
 W. B. DARROW, Superintendent Transportation.
Richmond, Manchester, Weldon, Rocky Mount, South Rocky Mount, Pinners Point, Tarboro, Contentnea, Wilmington, Florence, Selma. *Page 81 
Second. Defendant further alleges that the plaintiff's intestate (99) was guilty of negligence which directly contributed to bring about the injury complained of in the complaint, in that the plaintiff's intestate, while approaching the point where the accident occurred, was given the danger or stop signal by waving a lantern in the usual manner and acknowledged the same with his whistle, but failed to stop his train in time to avoid the accident; that if plaintiff's intestate had obeyed the instructions given in the schedule or time-table and bulletin above mentioned, he could have stopped his train in time to have avoided the accident, but that at the time he was disobeying and violating the said rules and regulations and instructions aforesaid, and running at a very high rate of speed, between forty and fifty miles per hour.
The following facts seem to be undisputed:
(1) That the intestate was running a first-class passenger train as engineer, at the time he was killed, on the main line of defendant; that the train was going north and the track was straight for more than two miles.
(2) That he was killed by running into an open switch, and colliding with another train.
(3) That as he approached the switch, his train was running at the rate of 30, 35 or 40 miles an hour.
(4) That the rules of the defendant required him to approach this switch at six miles an hour.
(5) That a switch lamp was maintained at this switch with a white and red light, and when the white light was turned to the track, it indicated safety and that the switch was all right for the main line, and the red light indicated danger.
(6) That the following rules were in force:
Rule 13, page 15. Any object waved violently by any one on or near the track is a signal to stop.
Rule No. 934. They (engineers) must have a copy of the current time-table, to which they must conform in running their trains, and a full set of signals which they must keep in good order and ready for immediate use. (100)
Rule 27. A signal imperfectly displayed, or the absence of a signal at a place where a signal is usually shown, must be regarded as a stop signal, and the fact reported to the superintendent.
Rule 7, page 14. Employees whose duty may require them to give signals must provide themselves with proper appliances, keep them in good order and ready for immediate use.
Rule 91 (A), page 31. The speed of a train would ordinarily be that of its schedule, but in cases of delay may be so moderately increased as in the judgment of the engineer and conductor will be safe *Page 82 
and prudent, due consideration always being given to condition of track, weather and all circumstances.
Rule 93, page 32. Within yard limits the main track may be used, protecting against third and fourth-class trains.
Third and fourth-class and extra trains must move within yard limits prepared to stop unless the main track is seen or known to be clear.
Rule 93 (a), page 32. Engines working within yard limits must clear the time of first-class trains five minutes.
Enginemen must know that switches are properly set before they attempt to pull in or out of siding.
B-72. Trains of the first class are superior to those of the second; trains of the second class are superior to those of the third, and so on.
(7) That the switch track led from the switch at which the intestate was killed on the main line, to what is called the lead track, which ran about parallel with the main line.
(8) That as the train on which the intestate was approached the switch (the distance from it being in dispute), another train of the defendant was on the lead track.
(9) That this last train consisted of an engine and fifteen cars of coal; that the cars were in front of the engine and the engine was running backwards.
(10) That it was the intention of the defendant for this train to remain on the lead track, but when it reached the switch going from the lead track to the main line, this switch was open or out of fix, and the train passed through the switch, across the switch track, (101) through the switch to the main line and on the main line, and as the intestate was approaching it ran back on the switch track, where the collision occurred.
(11) That the switch at which the intestate was killed was on the yards of the defendant at South Rocky Mount, and that there were numerous tracks and switches in said yards.
The facts in dispute relate to the condition of the switch at the main line; the condition of the lights at this switch; the conduct of the conductor, named Cole, in charge of the train that came from the lead track, after he discovered the switch at the main line was open; the distance from the switch, at that time, of the train on which the plaintiff's intestate was running, and the conduct of the plaintiff's intestate.
The plaintiff contends:
(1) That the switch at the main line was broken, and that the defendant has given no satisfactory explanation why it was so.
(2) That if the explanation of the defendant is accepted that it *Page 83 
was caused by the engine and cars running from the lead track, that this would not excuse the defendant, because the engine and cars could not have reached the switch at the main line but for the negligent act of the defendant in permitting the switch at the lead track to be open or out of fix.
(3) That a white light was turned to the main line, indicating safety, or there was no light at the switch, and the purpose of lights at the switch is not only to show its condition, but also its location.
(4) That at the time the conductor Cole discovered the switch was broken, he was at the switch, and the plaintiff's intestate was distant one and one-fourth miles; that he (Cole) could then have turned the red light to the main line, and if he had done so, it would have been seen, and the train on which the intestate was could have been stopped.
(5) That instead of doing so he waited until the intestate was in twenty-five yards of the switch before he gave any signal, and when he did so it was by waving a lantern some distance from the track and not across it.
The defendant contends:
(1) That it explained the breaking of the switch; that it was broken a few minutes before the plaintiff's intestate was killed (102) by the train coming from the lead track, and was the result of an accident.
(2) That there is no evidence that it was negligent in leaving the switch at the lead track open, but if this was a negligent act it was remote, and not the cause of the death of the plaintiff's intestate.
(3) That there is no evidence that the white light was turned to the main line, and if there was no light at the switch, this was notice to the plaintiff's intestate to stop, under the rules of the defendant.
(4) That at the time the defendant's conductor, Cole, discovered the switch was broken, the plaintiff's intestate was one-quarter mile from the switch, and if he (Cole) had then turned the red light on the main line, it would have been too late to stop the train.
(5) That the conductor, Cole, did all that a prudent man could do to avert any injury; that he waved his lantern across the track; that this was a danger signal, and if it did not cause the train to stop a red light would not have done so.
(6) That the plaintiff's intestate was running in violation of the rules of the defendant, and this was the cause of his death.
The material parts of the evidence are stated, but not all of it.
J. C. Mercer testified that he was police for defendant on its yards; that he went to the switch at 8 o'clock a. m. of 6 November, 1907; that he examined the switch; nothing was broken except the rod which throws the switch; that he tried to operate it, and it would not throw *Page 84 
the switch, but would turn the lamp; that the white glass was turned to themain line.
H. T. Cole, the conductor, testified: "As soon as I discovered that switch was broken, I ran down the track of the main line to flag No. 82 (Mr. Boney's train), and he was blowing the station blow when I signaled him down by stop signal, and he answered my signal by two short blasts, which was an answer to my signal, and understood that he knew what I meant, and then I stepped aside and he ran into the yard. Our train was then moving ahead, trying to get out of the way. Mr. Boney was a good quarter of a mile when he answered (103) my signal. I was twenty-five yards from the switch down the track towards Mr. Boney's train. He could have seen me for two miles signing him down. It was seventy-five yards from where switch left main line to where train collided with our train. Thewheels of my engine broke the rod which controlled the switch. . . . Boney blew the station blow and then immediately blew the two short blasts answering my signal. I got away far enough to keep myself from harm. I did not have time to get a red light and signal with, after I saw Boney's train was coming. I did not display any red light. I knew train was coming when I told engineer. It was an accident that we were out on the main line. We were trying to go on the lead, but got out on the main line. The switch which let us on the cross-over from the lead to the main line had been left open or was out of fix, so that instead of going on the lead we went on the switch which goes into the main line, then went on the main line; that is, the engine went on the main line and the switch at this point had the rod broken (that is, the switch at the main line). The only thing I know was when I got there the rod was broken, and I know of no other way it could have been broken except by my engine. I mean by that the engine I was using. I did not see the engine break it, but the engine had just got on the switch point at the main line just far enough to break the rod."
William Andrews testified: "I am fireman for defendant and have been for six years. Was on engine at the time of the accident. I was coming back dead-head to Rocky Mount from Fayetteville, to which point I had fired another train. I had run extra on this run for two years. Just as we got one and a quarter miles of South Rocky Mount station Mr. Boney blew one long blast. That was the station blow, and when he got within one mile of station, some one waved a white lantern, but not across the main line. He waved it across his body. I know what that meant. The signal was to stop. Mr. Boney shut off the steam. The man who gave the signal was twenty-five yards from the main line to one side. I do not know who he was signaling *Page 85 
to. The yard engine blew Mr. Boney, and he then blew two short blasts, and then he applied emergency brakes and stood up and reversed the engine. The switch is at the middle cross-over. (104)Mr. Boney was twenty-five yards from the switch when he answeredthe signal by two blasts and was in the switch or entering theswitch when he put on emergency brakes. Mr. Boney was running thirty-five to forty miles an hour when he turned off steam. . . . Mr. Boney was one and a quarter miles from the switch when he blewthe signal station blow and then he shut off the steam. I was looking over Mr. Boney's shoulder. It was usual for them to have lights at switch, but I did not see any. If there had been a red light at theswitch Mr. Boney could have seen it in time to stop at the rate hisengine was going. I do not know whether the man was signaling with a lantern, was signaling a train on the switch in the yard to stop, or signaling the train we were on."
Two or more witnesses testified that they saw no light at the switch.
The issues and the responses thereto are as follow:
First. Was the plaintiff's intestate killed by the negligence of the defendant as alleged in the complaint? Answer: Yes.
Second. Did plaintiff's intestate by his own negligence contribute to his own death? Answer: No.
Third. What damage is plaintiff entitled to recover of the defendant? Answer: Ten thousand dollars ($10,000).
The defendant appealed.
After stating the case: The first and second exceptions are to the refusal to allow a witness for the defendant, J. M. Donlan, an engineer, to answer the following questions:
First. If the jury shall find from the evidence that Mr. Boney's train had been running at six miles per hour at the time it collided with the train, and the other train with which it collided was running slowly in the same direction, what would have been the effect on the train and engine on which Mr. Boney was riding?
Second. If the jury shall find from the evidence that the engine and train which were being driven by Mr. Boney had (105) been running at the speed of six miles per hour or less at the time it struck the train of Conductor Cole, what would have been the effect of such collision and how greatly would it have damaged the train and imperiled the lives of those on board?
We do not think the ruling was erroneous. If the questions were *Page 86 
asked of the witness as an expert, there is no finding or admission that the witness was an expert. As was said by Justice Manning, in Lumber Co. v.R. R., 151 N.C. 220: "We can not assume that his Honor, in this view, found the witness to be an expert, and then excluded the question and answer. In order that the witness might testify when objection is made, there must be either a finding by the court, or an admission or waiver by the adverse party that the witness was so qualified."
The questions were also not permissible to elicit the opinion of the witness, as he was not present at the time of the occurrence and the jurors were as competent to form an opinion upon the facts as he. Taylor v.Security Co., 145 N.C. 385; Wilkinson v. Dunbar, 149 N.C. 20.
Again it does not appear that the defendant has been prejudiced by the refusal to permit the questions to be answered, as it is not shown in the record what would have been the answer of the witness, or what the defendant expected to prove by him.
The fourth, fifth and sixth prayers for instruction requested by the defendant were as follows:
Fourth. If the jury shall find that Boney was running his train at a greater rate of speed than six miles per hour at the time he passed the switch, then he was guilty of contributory negligence, and the jury will answer the second issue, Yes.
Fifth. If the jury shall find that Boney did not obey the rule set forth in the time-table, that he must approach the middle-yard crossover and the switch where the accident occurred with his train under full control and expecting to find the track occupied, but in disregard of this rule approached the said switch and cross-over without having his train under full control, then he was guilty of contributory negligence, and the jury must answer the second issue, Yes.
Sixth. Even though the jury shall find that the defendant was (106) guilty of negligence, yet if they shall also find that Boney did not obey the rule set forth in the time-table as to the rate of speed and manner in which he should approach the middle-yard crossing and switch where the accident occurred, then he was guilty of contributory negligence, and the jury must answer the second issue, Yes.
His Honor gave these instructions, except he added to each the element of proximate cause, which we think he ought to have done. The question of proximate cause will be considered in discussing other exceptions appearing in the record. The defendant relied principally on its motion to nonsuit, and the exceptions to the refusal to give the following instructions:
Seventh. That if the jury shall find from the evidence that at the *Page 87 
time No. 82, the train being run by Boney, deceased, was approaching the switch into which he ran and the switch had no lights, either red or white, and Mr. Boney knew there were no lights, either red or white, as a signal at the switch at the time, and he failed to slacken his speed and stop his engine, then he was guilty of contributory negligence, and the jury will answer the second issue, Yes.
Ninth. That it was the duty of Mr. Boney, engineer, to know the situation and location of the switches leading into the main line of the South Rocky Mount yards, and to observe whether the said switches were lighted and the signals indicated by it, and if the jury shall find from the evidence that the switch lamp at the place of accident was not lighted either with red or white lights, then it became the duty of Mr. Boney, deceased, to stop his engine and ascertain the cause, and to ascertain if it was safe to pass over the track at that point, and if he failed to do so, he was guilty of contributory negligence, and the jury will answer the second issue, Yes.
There are several reasons for refusing to give these instructions:
1. The answer does not allege that the plaintiff's intestate was guilty of contributory negligence in that he failed to perform the duties imposed upon him in the instructions, and a defendant must allege and prove contributory negligence. Stewart v. R. R., 137 N. (107) C., 690. A liberal construction of the answer discloses that it alleges two acts of contributory negligence and no other.
(1) That the intestate was disobeying a rule by running in excess of six miles an hour.
(2) That he failed to stop when the lantern was waved.
2. The instructions imposed the duty without qualification to know the exact location of the switch in the absence of a light, and to note that the light was not there. The injury occurred in the night on a yard of the defendant where there were numerous tracks and switches, and it was for the jury to say, under these circumstances, whether he could, by the exercise of ordinary care, have discovered the absence of a light in time to stop the train.
3. They omit the rule of the prudent man. If the intestate knew there was no light at the switch, he also knew that he was running a first-class train on the main line, and that it was the duty of the defendant to have the track clear five minutes before his train reached the switch, and if there was danger to turn the red light to the main line. He had the right to assume that these duties had been performed, and under the circumstances the question was raised as to whether he acted as a man of ordinary prudence, which it was for the jury to decide. The instructions require the court to decide, as matter of law, that the facts embodied in them constitute contributory negligence. *Page 88 
4. They omit the element of proximate cause. If the intestate knew there was no light at the switch and was running in excess of six miles an hour, he was negligent, but it is not every act of negligence, on the part of the plaintiff, that is contributory negligence in its legal sense.
It is not contributory unless it is the real cause of the injury, nor is it so if the defendant, by the exercise of ordinary care, can avert the injury, notwithstanding the negligence of the plaintiff. There was evidence that an employee of the defendant was at the switch and knew it was broken when the plaintiff's intestate was distant one and one-fourth miles, that this employee could have turned the red light to the main line and failed to do so; that if he had done so, (108) it could have been seen in time for the intestate to stop his train at the rate he was going.
If so, there was evidence that the failure to turn the red light to the main line was the proximate cause of the death of the intestate, and that notwithstanding the negligence of the plaintiff in failing to stop if he knew there was no light at the switch, that the defendant, by the exercise of ordinary care, could have averted the injury. It may be said that under the rules of the defendant, the absence of a light at the switch is notice of danger, and that if the intestate did not regard this, the display of a red light would not have caused him to stop. There is force in this view, but there may be a difference of opinion as to the conclusion. We think it would not be unreasonable to accept the other view, and conclude that if the intestate knew there was no light at the switch, he also knew it was the duty of the defendant to keep the track clear five minutes before his train reached the switch, and to display the red light if there was danger, and knowing these facts, he might proceed in the absence of a light, when he would not do so in the face of a red light, giving positive notice of danger.
The absence of a light would ordinarily indicate nothing except a failure to light the lamp, while a red light is a signal of danger.
"The law does not presume contributory negligence. It must be alleged and proven, and the defendant must show such facts, either omissions of such cautions or the doing of such acts, from which only one inference, to wit, the plaintiff's negligence, can be drawn, by men of ordinary reason and intelligence." Farris v. R. R., 151 N.C. 489.
We also conclude that the motion to nonsuit ought to have been denied. The open switch and the collision raise a presumption of negligence (Stewart v. R. R., 137 N.C. 689, and cases there cited), and where such a presumption is raised or a prima facie case is established, the jury is justified in finding negligence, unless "satisfied upon *Page 89 
all the evidence in the case that in fact there is no negligence," (109) as was said by Justice Walker, Kornegay v. R. R.,154 N.C. 389.
There is also other evidence of negligence on the part of the defendant; two switches open or broken; the failure to maintain lights at the switch; the failure to keep the track clear, and the failure to notify the plaintiff's intestate of danger, as he approached the switch.
There is also evidence of negligence on the part of the intestate.
Under these circumstances, the fact upon which the decision of the case turned was proximate cause, and if there was a phase of the evidence that would justify the jury in finding that, although the plaintiff was negligent, the defendant had the last opportunity, the last clear chance to avoid the injury, it was the duty of the judge to submit the question to them. Edge v. R. R., 153 N.C. 215, and cases there cited.
We have seen that the evidence presented this question. The jury could find from the evidence that an employee of the defendant was at the switch, and knew it was broken, and appreciated the danger to the approaching train when it was distant one and one-fourth miles; that he could have turned the red light to the main line in an instant, and that this would have been a warning of danger; that he failed to do so; that if he had done so the plaintiff's intestate could have seen the red light in time to stop the train before it reached the switch; that instead of doing so, he gave no signal until the train was in twenty-five yards of the switch, and then by waving a lantern some distance from the track and not across it, and if so, the jury could find that the negligence of the defendant was the proximate cause of the death of the intestate.
The jury could also reasonably find from the evidence that Rule 27, saying that "the absence of a signal at a place where a signal is usually displayed must be regarded as a stop signal," did not affect the right to recover because there was evidence that there was a light at the switch, and that the white light, a notice of safety, was turned to the main line. The plaintiff's intestate was killed about 2 o'clock a. m. J. C. Mercer, a witness for the defendant, testified that he went to the switch at 8 o'clock a. m., and that the white glass was turned to the main line. Between 2 o'clock and 6 o'clock (110) the switch, lamps and yards were in the possession and under the control of the agents of the defendant, and no witness was produced to show any change in conditions or that the lamp was touched after 2 o'clock after the time Mercer saw the white glass turned to the main line.
The case was submitted to the jury with great care, and the *Page 90 
contentions of the defendant were fairly presented. The presiding judge, among other things, charged the jury:
"If the jury shall find that witness Cole waved his lantern across the track of the approaching train of which Boney was engineer and Boney saw the signal, or with the exercise of ordinary care could have seen it, it was his duty to have stopped the engine, and if he could have done so in time to avoid his injury, then he was guilty of contributory negligence, and the jury will answer the second issue, Yes.
"If the jury shall find that Boney was running his train at a greater rate of speed than six miles per hour at the time he passed the switch, and shall further find that this was the proximate cause of the injury, then he was guilty of contributory negligence, and the jury will answer the second issue, Yes.
"If the jury shall find that Boney did not obey the rules set forth in the time-table, that he must approach the middle-yard cross-over and the switch where the accident occurred with his train under full control and expecting to find the track occupied, but in disregard of this rule approached the said switch and cross-over without having his train under full control (and this was the proximate cause of the injury), then he was guilty of contributory negligence, and the jury must answer the second issue, Yes.
"Even though the jury shall find that the defendant was guilty of negligence, yet if they shall find that Boney did not obey the rules set forth in the time-table as to the rate of speed and manner in which he should approach the middle-yard crossing and switch where the accident occurred (and this was the proximate cause of the injury), (111) then he was guilty of contributory negligence, and the jury must answer the second issue, Yes."
We have examined each exception and find
No error.