O. D. DELLINGER v. CHARLOTTE ELECTRIC RAILWAY
COMPANY.

(Filed 20 November, 1912.)

1. Pleadings—Variance—Merits—Appeal and Error—Interpretation
of Statutes.

The variance between the allegation and proof which will en-
title the opposing party to a new trial on appeal must be such
as to have misled him to his prejudice in maintaining his action
upon the merits. Revisal, secs. 515, 516.

2. Same—Party Not Misled.

In an action to recover damages of a street car company, it
was alleged as the ground of recovery, that the plaintiff was a
conductor on defendant's street car and was injured, while
assisting in getting the derailed car back upon the track, by
the negligence of the motorman in turning on the current when
he should have observed the danger to plaintiff in doing so. In
a separate paragraph it was alleged that the shock, causing the
injury complained of, was received, while using a switch rod,
furnished for the purpose in a certain position with reference
to the car and the rail, and the proof was that the position of
the rod was the reverse from that alleged: *Held,* the defendant
was not prejudiced by the variation in the allegation and proof;
(a) the ground of the action being the negligent turning on the
electricity by the motorman; (b) it appearing that the defend-
ant was ready with his evidence in rebuttal to the evidence ad-
mitted over its objection; (c) the trial judge substantially found
as a fact that the defendant had not been misled.

3. Street Cars—Electricity—Negligence—Proximate Cause—Instruc-
tions.

There being conflicting evidence in this case as to whether the
plaintiff, while engaged in his duties as defendant's conductor
on its electric street cars, in helping to replace a derailed car,
received the injury complained of by the negligence of the mo-
torman in turning on the electric current, seeing the danger to
the plaintiff, or whether it was the plaintiff's negligence in per-
mitting the trolley pole to remain on the wire while performing
his work: *Held,* the question of proximate cause was one for
the jury, and a prayer for special instruction which made the
issue as to contributory negligence depend upon the jury's find-
ing as to whether the plaintiff disobeyed instructions in leaving
the trolley pole on the wire while using the switch rod, if the
injury would not otherwise have occurred, is erroneous, as it

leaves out of consideration that the plaintiff, under the circumstances, may have safely done his work had not the electricity been negligently turned on.

APPEAL by defendant from *Lyon, J.,* at April Term, 1912, of MECKLENBURG.

This action is to recover damages for personal injuries caused, as the plaintiff alleges, by the negligence of the defendant.

The plaintiff was in the employment of the defendant as a conductor, and was engaged at the time of his injury in replacing a derailed car on the track.

The plaintiff, among other things, alleged in his complaint:

"(4) That after the derailment of the car as aforesaid, and after the electric current and voltage used in the operation of the said car had been turned off by the motorman in charge of the said car, it became the duty of the said plaintiff, in the course of his employment and under express instructions and directions from his *'alter ego'* and superintendent as aforesaid, to help in assisting in putting the car back on the 'T' iron or tracks, and in order to obey his express instructions and directions, and in the due course of his duty and employment, it was further necessary for this plaintiff to take an iron rod (commonly known as the switch rod) and fasten one end of the said rod to the derailed car and place the other end on the 'T' iron or track of the defendant company, in order to enable him to carry out his instructions and directions of the said superintendent as aforesaid, and further to get the car back on the track.

"(5) That while the plaintiff was thus engaged in carrying out the express instructions and directions of the said superintendent, as aforesaid, and without any default or misconduct on his part, and just as he had fastened the crooked part of the rod to the car and while still holding to same and in the act of placing the other end on the 'T' iron rail, the defendant company, its servants, agents and employees, without any knowledge or warning, or signal of danger to this plaintiff, notwithstanding the fact that the defendant company, its servants, agents and employees well knew, or by the exercise of ordinary care and diligence on its part could have known, the position in

which the plaintiff was, willfully, wantonly, and negligently turned and caused to be turned the entire current and voltage of electricity on the car and through its dynamo and on the 'T' iron and tracks where the plaintiff had hold of the switch rod, as aforesaid, and while carrying out the express orders and directions of the company and its superintendent, as aforesaid, thereby driving and causing to be driven the entire current and voltage of the electricity through the plaintiff's body, which said terrific electrical shock and electrical voltage, as aforesaid, rendered plaintiff unconscious, knocking him to the ground, leaving his hands gripped and pinned to the said rod."

When the case was called for trial, the plaintiff's counsel made a motion to amend sections 4 and 5 of his complaint, so as to allege that the plaintiff, in making the connection between the derailed car and the track, for the purpose of replacing the car upon the track, placed one end of the switch rod against the rail, and then placed the other end of the rod against the car, instead of the reverse of the proposition, as alleged in said sections of the plaintiff's complaint. The defendant objected to the change in the complaint, because it was a material one, and the defense had not prepared its case to meet such change in the plaintiff's proof. The court declined to permit the amendment, except upon the continuance of the case. Thereupon the plaintiff withdrew the motion and announced his readiness for trial.

The plaintiff was permitted to testify that he placed one end of the switch rod against the rail, and then placed the other end against the car, and defendant excepted upon the ground that the evidence did not conform to the allegation in the complaint.

The plaintiff gave the following account of his injury: "I am 23 years old, and live in Catawba County. I began work for the Charlotte Electric Company on 15 January, 1911. I was then in good health and weighed 160 to 175 pounds. I was employed by R. L. Womack, superintendent. He gave me an application blank, and after this was signed, sent me to the carshed; told me to stay there and look around for a few days, and he would put me on the line. I stayed there four and one-half days. No one helped me to look around. They called me in

the office and asked me a few questions and sent me out on the line. I was on the line five days. I knew nothing of running a street car, or of electricity, or the appliances, or workings. I went to work as a street car conductor on 15th January. The only instructions that Womack gave me were, if a car was derailed 'to take the switch rod on the car that the motorman used to throw the switch back, and use that switch rod connecting up that rail to the car.' He did not tell me how to do it. This was all he or any one else told me. As conductor, my duties were to help passengers on and off the cars, and I was instructed how to take up fares. I had been working for the company four months and eight days when I was injured. Never had a car derailed until the 23d May, the day I was hurt, and had no experience in putting them back. My car was derailed on Eleventh and Brevard streets, in the city of Charlotte, about 4 o'clock that day. It was a single-truck car, four wheels. Mr. Clark was the motorman. Clark reached out the window and about half-way threw the switch and pulled up on it at pretty good speed and split the switch and jumped the track. Two wheels went off the rails about 12 inches. I went to the front where Clark was and told him to knock out the overhead switch, cut it off, and I knocked out the one on the rear. I knocked the overhead switch, because I had learned from experience that that would keep the current off the lower part of the car, and there is no current on the car after the switch is throwed off. These overhead switches are to each end of the car and you knock them up or in, in case they pull out, and that cuts on or off the current. Clark cut off the controller and took the key out in his hand, so there would be no danger whatever from the current. I then told Clark not to start until I told him; that I would go back and take the rod and place it, and make the connection between the rail and the car. The switch rod is a steel or iron rod about 5 feet long and crooked at one end like a shepherd's crook. The rod was used to throw the switch and to connect up the rail to the car in getting the current to place the car back on the rail. This was a part of my duty, but I had never been instructed how to place the rod

by Womack or Drum. I learned to cut off the overhead switch by noticing it fly out when the motorman would be going fast. And one night, a short time before I was hurt, a man standing on the car knocked it in and told me to do that every time. I have knocked it in a hundred times, but the company did not show me. Clark was kinder mad that morning. I took the switch rod and placed it in the flange, where it turned the curve. I placed the small end of the rod on that flange and I took the other end, with the crook on it, and put it up to one side of the car over the rod, and it slid up on the rod and touched on the rail and rod too, and when I got it fixed just right, the current struck me.

"It was something like a half minute after I placed the rod when I felt the electric current pull me right down, and I felt a jumping sensation, and that is the last I remember.

"When I was employed by the defendant company, they sent me to the barn, but said nothing about instructions. Do not know who was in charge of the barn. Know Mr. Smith when I see him. Mr. Womack gave me a book about Westinghouse cars, but said 'there wouldn't be anything much in there about our cars, but to look over it.' These were not Westinghouse cars. Smith gave me no instructions. I stayed at the barn four and one-half days. Dodjin showed me how to punch transfers and take up fares. He told me about the streets and schedules. He never gave me any instructions about the trolley except to change it at the end of the line. He showed me how to pull it down and put it back on the line; to handle the trolley is the business of the conductor. In case it was necessary to take off the current, he told me I could either take off the trolley or knock out the overhead switch. In case of derailment of the car, Dodjin did not tell me to first remove the trolley pole, and then take the switch rod to make the connection from the rail to the car. He never mentioned how to replace a car if derailed. Womack only told me to take the rod and connect it up. The current is connected through the wire by means of the trolley to the controller and the car. The switch rod is used to make the connection between the car and the rail, when you get ready

DELLINGER *v.* ELECTRIC RAILWAY.

to turn the current on. The iron rod makes the channel or path for the current to pass to the rail. If one end is on the car and the other against the rail, the current would pass from the car to the rail.

"I was on the left side of the car, stooping down with the rod in both hands, and Clark, the motorman, was at the other end, with the key in his hands, waiting for me to give him orders. I did not give him any orders to move. He should have stood beside the car watching for orders. He could have stood with his head outside the car. If he had been standing thus watching me, when I got ready for him to turn on the current, I could have depended on his turning it on, both from what he saw and from what I told him. He could not turn it on from what he saw; that is against the rules, because it was dangerous for him to go fooling around, knocking in overhead switches. He should have watched; he should not have taken chances with a man's life. He should have stayed away from the controller while I was adjusting the rod. There would have been no danger if he had stayed away from the controller. He should have stayed till I got ready. He should not have done anything until I gave him the order. If the trolley had been taken off, the car could not have moved, unless down hill. The trolley was not taken off. To knock out the overhead switch is the same thing as pulling down the trolley, and when the car stopped I cut off the controller, knocked out the overhead switches, and that broke the connection, which acts the same as taking down the trolley pole. If the trolley was taken off, you could not get the current to the car."

There was evidence in behalf of the defendant that the plaintiff had been instructed by one employee, in the event of a derailment, "to knock off the overhead switch or take off the trolley pole," and by another, "to remove the trolley whenever using the switch rod to make a connection, and then put the trolley back on."

There was also evidence on the part of the defendant that the overhead switch had not been knocked in at the time of the injury, and that "the purpose of the overhead switch is to control the current to the motor, and then the power is off until the

overhead switch is knocked in.  There was an overhead switch over Clark's head and he could have knocked it in."

The defendant also offered evidence tending to prove that if the plaintiff had connected the rod first to the rail, as he testified, that the current would have passed to the car and he would not have been injured.

The defendant, in apt time and in writing, requested the court to give the following instructions, to wit:

"1. If the jury should find from the evidence that the plaintiff had been instructed by the agent of the defendant to always remove the trolley pole before using switch rod, and the plaintiff was acting in violation of such instructions, but for which the plaintiff would not have been injured, then the plaintiff was guilty of contributory negligence, and the jury should answer the second issue 'Yes.' "

The court declined to give this instruction, but modified the same by adding after the word "Yes," the following: "if you find that such contributory negligence was the proximate cause of plaintiff's injury," and the defendant excepted.

"2. If the jury should find from the evidence that the plaintiff was instructed by the defendant that before using the switch rod to always turn off the overhead switch or take down the trolley pole, and further instructed the plaintiff that to remove the switch and not the trolley pole, that the current might still pass to the car, and that to remove all danger, to take down the trolley pole, and if the jury find from the evidence that the plaintiff was endeavoring to use the switch rod without removing the trolley, and that a man of ordinary prudence, under the same circumstances, would not have done so, then the plaintiff would have been guilty of contributory negligence, and the jury should answer the second issue 'Yes.' "

The court declined to give this instruction, as asked by the defendant, and modified the same by the addition of the following: "if you find that such contributory negligence was the proximate cause of the plaintiff's injury," and the defendant excepted.

His Honor charged the jury on the issue of contributory negligence as follows:  "Contributory negligence is such an act or

DELLINGER *v.* ELECTRIC RAILWAY.

omission on the part of the plaintiff, concurring or coöperating with some negligent act or omission on the part of the defendant as makes the act or omission of the plaintiff the proximate cause of the injury complained of. Proximate cause means the direct cause, producing a result without any other cause supervening and bringing about the injury. If you find from the evidence and by the greater weight of the evidence, the burden being on the defendant, that, notwithstanding the negligence of the plaintiff, that the plaintiff's injuries were caused by his contributory negligence, by not obeying orders that were given him as to how to place a derailed car back on the track, that it was proximately caused by his failure to pull down the trolley pole and disconnect the current, or was caused by his ordering the motorman to go forward or come backward, if you find that he did so—if you find that his injury was proximately caused by such conduct on his part, it will be your duty to answer the second issue 'Yes'; otherwise, answer it 'No.'"

Upon the return of a verdict in favor of the plaintiff, the defendant moved the court to set aside the verdict of the jury and for a mistrial on the ground of variance between the plaintiff's allegation and the proof.

Motion overruled, and defendant excepted, the court stating that he did not see how the defendant was misled.

There was a judgment in favor of the plaintiff, and the defendant appealed.

*T. L. Kirkpatrick, E. R. Preston, and Clarkson & Duls* for *plaintiff.*

*Pharr & Bell and Osborne & Cocke* for *defendant.*

ALLEN, J. The plaintiff alleges that at the time of his injury he was using an iron rod to replace the derailed car on the track, and that he first connected the rod with the car and then with the rail, and he was permitted to prove that he first connected the rod with the rail and then with the car.

The defendant insists that this is a material variance, because it changed its line of defense and gave it no opportunity to prepare its evidence to meet the case of the plaintiff as proved; that if the evidence of the plaintiff had conformed to

his allegation, it was prepared to show that he was acting in disobedience of instructions, and that if he had alleged his cause of action as he proved it, the defendant could have furnished evidence that the plaintiff could not have been injured if he had connected the rod with the rail and then with the car.

There is undoubtedly a variance, but it is not every variance between allegation and proof which will justify granting a new trial.

The Revisal, secs. 515 and 516, establishes the standard.

Section 515: "No variance between the allegation in a pleading and the proof shall be deemed material unless it has actually misled the adverse party to his prejudice in maintaining his action upon the merits. Whenever it shall be alleged that a party has been so misled, that fact shall be proved to the satisfaction of the court, and in what respect he has been misled; and thereupon the judge may order the pleading to be amended upon such terms as shall be just."

Section 516: "Where the variance is not material as provided in the preceding section, the judge may direct the fact to be found according to the evidence, or may order an immediate amendment without costs."

Commenting on these sections, as contained in The Code of 1883, *Merrimon, J.,* says in *Mode v. Penland,* 93 N. C., 295: "It may be that the court rejected the evidence because there was a variance between it and the allegations in the complaint. If so, still the evidence should have been received, because the variance was not such as misled the defendant to his prejudice in making his defense. The substance of the material allegations of the complaint was that the defendant, by the negligence of his agent in the course of the business of his agency, injured the plaintiff. The evidence tended to show that the agent was not exactly such as alleged, but it went to prove that he was such agent in substance and effect, although he may have been the defendant's partner."

In *Asbury v. R. R.,* 125 N. C., 575, the plaintiff alleged that the defendant *caused* the car to start, and was permitted to prove that the car started because of a failure to perform some duty, and in *Coore v. R. R.,* 152 N. C., 702, it was held, "There is

DELLINGER *v.* ELECTRIC RAILWAY.

no material variance between the allegations and the proof in an action for damages for personal injuries, the averments of the complaint substantially being that the alleged injury was caused by the negligent, etc., starting the train of defendant railroad company by the engineer, without signal or warning, which violently jerked the slack out of the train, pulled the cars farther apart, causing plaintiff to miss his footing and fall, to his injury, between the cars; and the evidence objected to being that 'the engineer started off at high speed—quick start,' etc."

Applying these principles, we are of opinion there is no material variance.

(1) The act of negligence complained of is not in the fourth paragraph of the complaint, but in the fifth, and consists in the allegation that while engaged in replacing the car, the current was negligently turned on, and the manner in which he was doing the work was mere matter of inducement.

(2) The defendant denied the fourth allegation of the complaint, and introduced several witnesses, who were present and knew how the rod was placed. The fair inference is, that if the plaintiff had testified according to his allegation, that the defendant would have proved that he connected the rod with the rail and then with the car.

(3) The defendant was not misled, because it introduced evidence that the plaintiff could not have been injured if he placed the rod as he testified, and it did not attempt to show, on the motion for a new trial or since, that it could produce other evidence to the same effect, and if we were to send the case back for a new trial, upon the ground of a fatal variance, we cannot see, upon an amendment of the complaint, that the evidence on such trial would not be as it is now presented to us.

(4) His Honor substantially found that the defendant had not been misled.

Nor do we think there was error in the modification of the prayers for instruction, by adding the element of proximate cause. The theory of the plaintiff was, that after the derailment he knocked out the overhead switch, and that this broke the connection and made it safe for him to continue his work; that he was working in full view of the motorman and the

switch was over his head; that while he was doing his work, the motorman knocked in the overhead switch and turned on the current; that he was not disobeying instructions as to the manner of placing the rod, but if he was, the motorman knew it, and that the proximate cause of the injury was the act of the motorman, and there was evidence to support this theory.

. If so, it would seem to follow that the use of the language in the prayer for instruction, "but for which the plaintiff would not have been injured," is itself equivalent to a charge that the negligence of the plaintiff must be proximate, in which event the words, added to the instruction, detracted nothing from its force, for it was the duty of his Honor to tell the jury that the disobedience of instructions must be the proximate cause.

In other words, if the defendant instructed the plaintiff to remove the trolley pole before attempting to replace a derailed car, and he failed to do so, and the plaintiff was working in full view of the motorman, who knew the trolley pole had not been removed and of the dangerous position of the plaintiff, and the motorman then turned on the current and injured the plaintiff, the real cause of the injury was the act of the motorman. *Boney v. R. R.,* 155 N. C., 95.

This view of the case was excluded by both prayers for instruction.

We find no error.

No error.